UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| URSA MAJOR UNDERGROUND, INC., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LIBERTY MUTUAL INSURANCE COMPANY and SCHMID PIPELINE CONSTRUCTION, INC., | ) ) ) |
| | ) |
|     Defendants | ) |
| _____ | )    1:14-cv-00162-DBH |
| | ) |
| UTILITY SERVICES AUTHORITY, LLC, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LIBERTY MUTUAL INSURANCE COMPANY and SCHMID PIPELINE CONSTRUCTION, INC., | ) ) ) |
| | ) |
|     Defendants | ) |

**RECOMMENDED DECISION ON PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

In these consolidated actions, Plaintiffs Ursa Major Underground and Utility Services Authority seek to obtain payment for horizontal directional drilling services provided on the Kennebec Valley Pipeline Project (the Project) pursuant to subcontracts with Defendant Schmid Pipeline Construction, Inc., the general contractor for the Project. The matter is before the Court

1

on Plaintiffs' consolidated motion for summary judgment (Plaintiffs' Motion for Summary Judgment ("Motion"), ECF No. 38).[1]

As explained below, following a review of the record, and after consideration of the parties' arguments, I recommend that the Court grant in part and deny in part the motion.

## BACKGROUND

### *The Principal Contract*

On May 24, 2013, Schmid, as "Contractor", and Summit Natural Gas of Maine, Inc., as "Owner", entered into a construction contract ("the Principal Contract" or "Construction Contract") pursuant to which Schmid agreed to perform certain work in connection with the construction of the Project. (Pls.' Stmt. of Material Facts ("PSMF") ¶ 1, ECF No. 39.)[2]

Prior to September 27, 2013, Schmid's scope of work under the Construction Contract included limited horizontal directional drilling ("HDD") work. (*Id.* ¶ 8.) On September 27, Schmid and Summit executed a "First Amendment and Restatement of Exhibit A and All Construction Work Orders to the Construction Contract" (the "First Amendment") for the purpose, inter alia, of clarifying certain payment terms under the Construction Contract. (*Id.* ¶ 11.) As part of the First Amendment, Summit added some HDD work to Schmid's scope of work and agreed that all HDD subcontractor work would be billed to Summit as a pass-through cost by Schmid with a ten percent (10%) markup. (Defs.' Stmt. of Additional Material Facts ("DSAMF") ¶ 4, ECF No. 44.)[3]

---

[1] The Court referred the motion for report and recommended decision.

[2] Citations to Plaintiffs' Statement of Material Facts are meant to include reference to Defendants' Opposing Statement of Material Facts (ECF No. 43).

[3] Citations to Defendants' Statement of Additional Material Facts are meant to include reference to Plaintiffs' Reply Statement of Material Facts (ECF No. 45).

Rider No. 1 to the First Amendment is titled "Amended & Restated Exhibit A," and provides that all of Schmid's costs for labor, equipment, materials, and subcontractors were to be invoiced by Schmid and paid by Summit on a time and materials basis. (PSMF ¶ 12.) Rider No. 1 clarified that Schmid's material and subcontractor costs were not to be charged to and paid by Summit on a unit price basis, but rather all such costs were to be charged and paid as a pass-through, with a 10% markup added by Schmid. (*Id.* ¶ 13.)

Riders Nos. 2 and 3 to the First Amendment are each titled "Amended and Restated Construction Work Order and Project Schedule;" each provides that "[e]ach HDD Subcontractor invoice shall be passed through to [Summit] at actual cost to [Schmid] with a ten percent (10%) mark-up" and that "[t]he Parties agree that [Schmid's] final price is based upon time and material charges per the rates set forth in the Amended and Restated Exhibit A for actual work completed." (*Id.* ¶ 14.)

### *Liberty Mutual's Payment Bond*

On June 7, 2013, Liberty Mutual Insurance Company, as surety for Schmid, executed and issued Payment Bond No. 268001434 in the amount of $6,300,000, on Schmid's obligation under the Construction Contract. (*Id.* ¶ 2; DSAMF ¶ 4.) The Payment Bond guaranteed Schmid's payment with respect to the Project subject to the following provision:

> Surety shall have no liability to any Claimant under this Bond for any amount unless it is due and owing to the Claimant by the Principal pursuant to the express terms of the contract between the Principal and the Claimant or, if the Claimant does not have a direct Contract with the Principal, pursuant to the terms and conditions of the Contract between the Claimant and the Subcontractor to the Principal. The Bond incorporates all of the Principal's contractual defenses, including but not limited to pay-if-paid provisions, whereby payment to the Claimant is subject to the condition precedent of the Obligee's payment to the Principal, and other limitations on amounts due under the contract between the Principal and the Claimant.

(DSAMF ¶ 6, citing PageID # 380.)

On June 19, 2013, Schmid commenced performance of its work on the Project. (PSMF ¶ 3.) Joshua E. ("Josh") Purrenhage is the Vice President of Operations for Schmid, and served as Schmid's project manager for the Project. (*Id.* ¶ 4.) Kim M. Smith is the Vice President and Controller for Schmid. She was responsible for billing Summit for work performed by Schmid. (*Id.* ¶ 5.) Tony Layrock, Jr., was the on-site project manager. (*Id.* ¶ 6.) Timothy Johnston is the Executive Vice President for Summit. He was responsible for overseeing the Project. (*Id.* ¶ 7.)

### *Ursa Major subcontract*

Ursa Major arrived at the Project site on September 3, 2013, to prepare to perform HDD work. (*Id.* ¶ 10.) On October 1, 2013, Schmid, through Kim M. Smith, and Ursa Major, through its Managing Member George Grassie, executed a written subcontract with an "effective date" of September 3, 2013, pursuant to which subcontract Ursa Major agreed to perform horizontal directional drilling at Schmid's direction. Schmid agreed to pay Ursa Major at the "rates stated in Exhibit B" to the subcontract, subject to the terms and conditions set forth in the subcontract. (*Id.* ¶ 15.) Exhibit B to the Ursa Major subcontract – titled Subcontractor Rates – contained applicable rates for Ursa Major's work on the Project. (DSAMF ¶ 10.) After executing the subcontract, Ursa Major performed HDD work on the Project at Schmid's direction. (*Id.* ¶ 13.)

The Ursa Major subcontract did not identify any plan, drawing, or specification describing or detailing the HDD work to be performed by Ursa Major on the Project.[4] (PSMF ¶ 17.) The Ursa Major subcontract contains the following provision at Article VI, Section 6.2: "Upon acceptance of the invoice, Contractor shall pay Subcontractor's invoice within seven (7) days after Contractor receives payment from Client." (*Id.* ¶ 19.) The subcontract also included "Article X

---

[4] Defendants assert that the Subcontracts incorporated by reference the terms of the Principal Contract between Schmid and Summit. However, the record does not reflect that the Principal Contract contained any plan, drawing, or specification for the HDD portion of the work.

4

– Termination for Convenience", which provides that "Contractor may terminate the employment of Subcontractor at any time and cancel this Subcontract without cause or fault on the part of the Subcontractor, and in such event, Contractor shall be liable only for those amounts as agreed to in Exhibit B of this Subcontract."  (DSAMF ¶ 9.)

The parties dispute whether the subcontract "incorporates by reference" the terms of the Construction Contract.  (*E.g.*, DSAMF ¶¶ 11 – 12.)  The subcontract states that "[a]ll obligations of performance stated in the Principal Contract are incorporated in the Subcontract to the full extent that the Principal Contract or any part of it is applicable to the Work."  (Article II, Section 2.1, PageID # 335.)  Additionally, the subcontract provides that "[t]o the extent the Principal Contract requires the performance of any act or imposes any obligation on Contractor as it relates to the performance or completion of the Work, Subcontractor assumes such performance and/or obligation of the Contractor" (*Id.*, Section 2.2), and that "[t]he client and Contractor shall have the same rights and remedies stated in the Principal Contract against Subcontractor as the Client has against Contractor, and any such rights or remedies in the Principal Contract are incorporated in this Subcontract."  (*Id.*, Section 2.3.)

Prior to executing the subcontract with Ursa Major, neither Kim Smith nor any other representative of Schmid informed Ursa Major (1) that an issue or dispute existed between Schmid and Summit regarding the Project, including whether Schmid was to be paid by Summit on a time and materials basis for work performed on the Project (PSMF ¶ 22), or (2) of the date(s) on which Schmid was scheduled to receive payment from Summit.  (*Id.* ¶ 24.)[5]

---

[5] Schmid denies this assertion and maintains that Ursa Major should have been aware of the procedure because the contract terms were incorporated by reference into the subcontract.  (*Id.*)

Ursa Major submitted to Schmid Invoice Nos. 1006-003 and 1006-004 in the total amount of $1,756,248.06 for HDD work performed on the Project at the direction of Schmid. (*Id.* ¶ 26.) Neither Schmid nor Liberty Mutual has paid the amounts due under the invoices. (*Id.* ¶ 28.)

On November 20, 2013, Schmid notified Summit of the termination of the Construction Contract due to Summit's "material breach of its payment obligations under the Contract and First Amendment." (*Id.* ¶ 32.) By writings dated November 20, 2013, Schmid also notified Ursa Major that its subcontract was "terminated immediately," and instructed Ursa Major to "cease performance under the Subcontract upon receipt of this notice." (*Id.* ¶ 33.) As instructed by Schmid, Ursa Major demobilized from the Project on or about November 25, 2013. (*Id.* ¶ 34.)

Schmid did not terminate its subcontract with Ursa Major pursuant to Article IX of the subcontract (the "Subcontractor's Default" provision), or otherwise by reason of any default or failure of performance on the part of Ursa Major. (*Id.* ¶ 36.) Instead, Schmid terminated the subcontract due to contractual disputes between Schmid and Summit. (*Id.* ¶ 38.)

Schmid and Liberty Mutual have each refused to make payment to Ursa Major on its Invoice Nos. 1006-003 and 1006-004 in the total amount of $1,756,248.06 because Schmid has not been paid by Summit for the HDD work performed by Ursa Major. (*Id.* ¶ 40; DSAMF ¶¶ 32 – 33.) In addition, Schmid contends that its nonpayment is based on Summit's assertion that some of the HDD work was deficient or performed inefficiently. (PSMF ¶ 40.)

Joel Iakiri, Schmid's Director, states in his declaration (ECF No. 44-1), that Ursa Major's work "was not performed without issue" because Ursa Major did not complete a portion of the work. (DSAMF ¶¶ 27 – 28.) In support of his assertion, Mr. Iakiri cites the deposition testimony of Bryon Foster, a Summit executive, that the "only criticism … of the HDD drilling … [was that] they had a company come do one of the drills and ran into some issues," and that Summit arranged

6

for another company to complete the HDD work "after Schmid left." (Foster Dep. at 176 – 77, ECF No. 35-54.)[6]

### *Utility Services subcontract*

On November 3, 2013, following a bidding process, Schmid, through Kim M. Smith, and Utility Services, through its officer Mark Helsel, executed a written subcontract (with an "effective date" of October 16, 2013) pursuant to which subcontract Utility Services agreed to perform HDD work at Schmid's direction. Schmid agreed to pay Utility Services at the "rates stated in Exhibit B" to the subcontract, subject to the terms and conditions set forth in the subcontract.[7] (PSMF ¶ 16; DSAMF ¶¶ 15 – 16.) Exhibit B sets forth rates for HDD work. (DSAMF ¶ 23.) After execution of the Utilities Services Subcontract, Utilities Services performed HDD work on the Project as directed by Schmid. (*Id.* ¶ 26.)

The Utility Services subcontract did not identify any plan, drawing, or specification describing or detailing the HDD work to be performed by Utility Services on the Project.[8] (PSMF ¶ 17.) The Utility Services subcontract contains the following provision: "Upon acceptance of the invoice, Contractor shall pay Subcontractor's invoice within three (3) days after Contractor receives payment from Client." (*Id.* ¶ 20.) Article X – Termination for Convenience provides that "Contractor may terminate the employment of Subcontractor at any time and cancel this

---

[6] Ursa Major objects to Mr. Iakiri's statement on the ground that Mr. Iakiri does not have personal knowledge of his assertions of facts regarding the existence of "issues." Ursa Major also assets that the Foster deposition testimony is hearsay and cannot be relied on to support Mr. Iakiri's statement. Otherwise, Ursa Major denies the statement, noting that its work was performed at Schmid's direction, that Schmid has not identified any work that Ursa Major failed to perform, and that there was no defined scope of work with respect to the HDD portion of the Project. (Pls.' Reply Stmt. ¶ 28.)

[7] On November 3, 2013, Schmid, by Kim M. Smith, executed the "Amendment to Exhibit 'B'" to the Utility Services Subcontract which had been executed on behalf of Utility Services on October 30, 2013. (PSMF ¶ 17.)

[8] Defendants assert that the subcontracts incorporated by reference the terms of the Principal Contract between Schmid and Summit. However, the record does not reflect that the Principal Contract contained any plan, drawing, or specification for the HDD portion of the work.

Subcontract without cause or fault on the part of the Subcontractor, and in such event, Contractor shall be liable to Subcontractor only for those amounts as agreed to in Exhibit B of this Subcontract." (DSAMF ¶ 22.)[9]

Before executing the subcontract with Utility Services, neither Ms. Smith nor any other representative of Schmid informed Utility Services (1) that an issue or dispute existed between Schmid and Summit regarding the Project, including whether Schmid was to be paid by Summit on a time and materials basis for work performed on the Project (PSMF ¶ 23), or (2) of the date(s) on which Schmid was scheduled to receive payment from Summit. (*Id.* ¶ 25.)[10]

Utility Services submitted to Schmid six applications and certificates for Payment in the total amount of $574,664.03 for HDD work performed on the Project at the direction of Schmid. (*Id.* ¶ 29.) Neither Schmid nor Liberty Mutual has paid the amount owed Utility Services. (*Id.* ¶ 31.)

On November 20, 2013, Schmid notified Summit of the termination of the Construction Contract due to Summit's "material breach of its payment obligations under the Contract and First Amendment." (*Id.* ¶ 32.) On the same date, Schmid also notified Utility Services that its subcontract was "terminated immediately," and instructed Utility Services to "cease performance under the Subcontract upon receipt of [the] notice." (*Id.* ¶ 33.) As instructed by Schmid, Utility Services ceased work on the Project on or about November 21, 2013. (*Id.* ¶ 35.)

Schmid did not terminate its subcontract with Utility Services pursuant to Article IX (the "Subcontractor's Default" provision) of the subcontract, or otherwise due to a default or the failure

---

[9] As with the Ursa Major subcontract, the subcontract with Utility Services also "incorporates" certain terms, rights and/or obligations found in the Principal Contract. (*Id.* ¶ 24.)

[10] Schmid maintains that Utility Services should have known of the terms between Schmid and Summit because the contract was incorporated into the subcontract. (*Id.*)

of performance on the part of Utility Services. (*Id.* ¶ 37.) Instead, Schmid terminated the subcontract with Utility Services because of a dispute between Schmid and Summit. (*Id.* ¶ 38.)

After November 20, 2013, Summit made a payment to Utility Services in the amount of $86,199.60. (*Id.* ¶ 39.) Schmid and Liberty Mutual have each refused to make payment to Utility Services on its applications and certificates for payment in the total net amount of $488,464.43 because Schmid has not been paid by Summit. (*Id.* ¶ 41; DSAMF ¶¶ 32 – 33.) Schmid also asserts that its nonpayment is based on Summit's contention that some of the HDD work was deficient or was performed inefficiently. (PSMF ¶ 41.)

### *Schmid v. Summit – parallel litigation*

On December 18, 2013, Schmid filed its complaint against Summit (case number 1:13-cv-00464-GZS). (PSMF ¶ 44.) In its complaint, Schmid asserts that Summit failed to "make all payments required under the Contract and First Amendment." (*Id.* ¶ 45.) Summit filed a counterclaim in which it contends that Schmid's invoices were inflated and that the work was not performed efficiently.[11] (DSAMF ¶ 37.) In support of its counterclaim, Summit has retained an expert who has opined that Schmid's work was inefficient.[12] (*Id.* ¶ 39.) Schmid denies these assertions and maintains that the invoices should be paid. (*Id.* ¶¶ 38, 40.) The *Schmid v. Summit* litigation proceeded beyond the discovery and summary judgment stages. The parties recently notified the Court that the matter is resolved. (ECF No. 156.)

---

[11] The HDD work performed by Ursa Major and Utility Services was only one component of the pipeline work that Schmid contracted to perform.

[12] Utility Services objects to this statement because it is based on Mr. Iakiri's deposition and the expert's report is hearsay. The objection is overruled because the expert opinion is not offered for the truth, only to reflect Summit's contention. However, Defendants also attempt to draw certain conclusions from the expert's opinion, including that the HDD invoices should be reduced by 29% to 46% based on the expert's "across-the-board analysis implicating all work on the project." (DSAMF ¶ 41.) Because the expert's opinion does not differentiate between the primary work of laying pipe and the more limited HDD work, the opinion does not support such a contention. Plaintiffs also propose that, if the statement is taken as true, Defendants should pay them at least 54% of the sum of their outstanding invoices. (Pls.' Reply Stmt. ¶ 41.)

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Hannon v. Beard*, 645 F.3d 45, 47-48 (1st Cir. 2011). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims or defenses, a trial-worthy controversy exists and summary judgment must be denied. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

## DISCUSSION

Plaintiffs contend that they are entitled to summary judgment on all claims and counterclaims because the record establishes the lack of a "genuine dispute as to any material fact." (Motion at 1, 20.) The parties' primary disagreement involves the interpretation and application of Section 6.2 of the subcontracts, which section provides that Defendant Schmid will satisfy the subcontractor's invoices within seven days (in the case of Ursa Major) or three days (in the case of Utility Services) of Summit's payment to Defendant Schmid. The undisputed record establishes that Summit has not paid Defendant Schmid for the work that is the subject of this action.

The parties agree that Section 6.2 is in essence a "pay-when-paid" clause; that the clause does not permit the contractor to deny payment in the event the contractor is not paid; and that the clause imposes an obligation on the contractor to make payment within a reasonable period of time when an ongoing dispute or other circumstances delay or prevent payment to the contractor. In Plaintiffs' view, the reasonable period of time has expired. Defendants maintain that the reasonable period for payment should be measured by the *Summit* litigation, which Schmid has diligently pursued.

The parties also dispute whether Summit's counterclaim in the *Summit* litigation, in which Summit alleges inefficiencies and deficiencies in Schmid's performance under the Principal Contract, constitutes a defense to Plaintiffs' claims for payment under either the terms of the subcontracts or the Payment Bond. Plaintiffs contend that the counterclaim is immaterial because Schmid terminated the subcontracts pursuant to Article X, on grounds of convenience, and not under Article IX for subcontractor default. Defendants, however, cite the provisions of Article II of the subcontracts, which provisions incorporate and bind the subcontractors to the "obligations of performance" of the Principal Contract, and permit Schmid to rely on the "same rights and remedies stated in the Principal Contract against Subcontractor as the Client [Summit] has against Contractor [Schmid]."[13]

### A.   Plaintiffs' Entitlement to Payment

The central question presented by the summary judgment motion is whether Plaintiffs are currently entitled to payment for their work. As explained below, Plaintiffs are entitled to payment without waiting further for Schmid to receive payment from Summit.

---

[13] Liberty Mutual's obligations under the Payment Bond are measured by the same standards because the Payment Bond incorporates Schmid's contractual defenses.

11

### 1. *Pay-When-Paid Terms*

The subcontracts are governed by the laws of the state where the work is performed. (Article XXV, PageID # 347.)  Maine law, therefore, governs the resolution of the dispute.  The issue can be summarized as follows:  under a "pay when paid" contract between a subcontractor and a contractor, if the party responsible to pay the contractor refuses to pay or delays payment to the contractor, when must the contractor pay the subcontractor?  The parties do not cite, nor has independent research revealed, Maine common law that directly addresses this issue.  In the absence of applicable Maine common law, one must look to persuasive precedent from other states to determine whether an "informed prophecy" can be made about the rule Maine's highest court would adopt under the circumstances.  *Phoung Luc v. Wyndham Mgmt. Corp.*, 496 F.3d 85, 88 (1st Cir. 2007).

Generally, a contract provision stating that a subcontractor will be paid after the contractor is paid will be construed as either a "pay-when-paid" clause or a "pay-if-paid" clause.[14]  Contract language that explicitly states that payment of the general contractor is a condition precedent[15] to payment of the subcontractor is characterized as a pay-if-paid clause.  *See*, *e.g.*, *BMD Contractors, Inc. v. Fid. & Deposit Co. of Maryland*, 679 F.3d 643, 649 (7th Cir. 2012), *as amended* (July 13,

---

[14] "Courts have not uniformly applied these terms." *MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc.*, 436 F.3d 1257, 1261 (10th Cir. 2006) (noting that some courts refer to both situations as "pay-when-paid" clauses) (citing Robert F. Carney & Adam Cizek, *Payment Provisions in Construction Contracts and Construction Trust Fund Statutes: A Fifty–State Survey,* 24 Construction Law. 5 (2004)).

[15] Under Maine law:

> Whether the condition attached to the payment of the price be a condition precedent or subsequent depends upon the intention of the parties to the contract, to be determined by considering not only the words of the particular clause, but also the language of the whole contract as well as the nature of the act required and the subject matter to which it relates.

*Loyal Erectors, Inc. v. Hamilton & Son, Inc.*, 312 A.2d 748, 753 (Me. 1973).  *See also id.* at 753 – 55 (discussing condition precedent cases arising from retainage provisions in construction contracts).

2012) (applying Indiana law). A pay-if-paid clause provides that the general contractor is not obligated to pay the subcontractor until the general contractor is paid and thus typically shifts the risk of client default onto the subcontractor. *See id.*

In the absence of explicit language to establish a condition precedent, however, language that requires payment to the subcontractor within a certain time period after the contractor is paid is characterized as a pay-when-paid clause. "In contrast to a pay-if-paid clause, a pay-when-paid clause does not establish a condition precedent, but merely creates a timing mechanism for the general contractor's payment to the subcontractor." *Sloan & Co. v. Liberty Mut. Ins. Co.*, 653 F.3d 175, 180 (3d Cir. 2011) (applying Pennsylvania law).

> A typical "pay-when-paid" clause might read: "Contractor shall pay subcontractor within seven days of contractor's receipt of payment from the owner." Under such a provision in a construction subcontract, a contractor's obligation to pay the subcontractor is triggered upon receipt of payment from the owner. Most courts hold that this type of clause at least means that the contractor's obligation to make payment is suspended for a reasonable amount of time for the contractor to receive payment from the owner. The theory is that a "pay-when-paid" clause creates a timing mechanism only. Such a clause does not create a condition precedent to the obligation to ever make payment, and it does not expressly shift the risk of the owner's nonpayment to the subcontractor....

*MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc.,* 436 F.3d 1257, 1261 (10th Cir. 2006) (quoting Robert F. Carney & Adam Cizek, *Payment Provisions in Construction Contracts and Construction Trust Fund Statutes: A Fifty–State Survey,* 24 Construction Law. 5 – 6 (2004)). *See also Thos. J. Dyer Co. v. Bishop Int'l Eng'g Co.*, 303 F.2d 655, 660 – 61 (6th Cir. 1962) (generally described as the seminal authority on the issue)[16]; *A. J. Wolfe Co. v. Baltimore Contractors, Inc.*, 244 N.E.2d 717, 720 – 21 (Mass. 1969) (collecting cases) ("In the absence of a clear provision that

---

[16] In *Dyer*, the language in question provided that the subcontractor would not be paid "until five (5) days after Owner shall have paid Contractor." *Thos. J. Dyer Co.*, 303 F.2d at 656. The court reasoned that the language was "a reasonable provision designed to postpone payment for a reasonable period of time after the work was completed, during which the general contractor would be afforded the opportunity of procuring from the owner the funds necessary to pay the subcontractor." *Id.* at 661.

payment to the subcontractor is to be directly contingent upon the receipt by the general contractor of payment from the owner, such a provision should be viewed only as postponing payment by the general contractor for a reasonable time … so as to afford the general contractor an opportunity to obtain funds from the owner."); *R.N. Robinson & Son, Inc. v. Ground Imp. Techniques*, 31 F. Supp. 2d 881, 887 (D. Colo. 1998) ("[T]he 'overwhelming majority of jurisdictions' do not construe 'pay when paid' clauses as conditions precedent to payment.") (quoting *Koch v. Constr. Tech., Inc.*, 924 S.W.2d 68, 71 (Tenn. 1996)).

Given that a majority of jurisdictions to consider the issue have recognized a distinction between a "pay when paid" provision and a "pay if paid" contractual term, and given the logic of the distinction, one can reasonably conclude that the Maine Law Court would recognize the distinction and assess the issue accordingly. In this case, the subcontracts obligate Schmid to pay within a certain number of days after receipt of payment from Summit. The payment clauses do not establish that payment to Schmid is a condition precedent to payment of the subcontractors. Instead, the language is consistent with language that courts have construed as "pay when paid" provisions. In fact, the parties appear to agree that the subcontracts are in fact "pay when paid" agreements.

Defendants argue, however, that because they have diligently pursued payment from Summit, they should be permitted to await the outcome of the pending litigation between Schmid and Summit before they are obligated to pay Plaintiffs. (Opposition at 9 – 12.) Defendants' argument is unconvincing. Insofar as Plaintiffs have awaited payment for nearly two years, to require Plaintiffs to continue to wait for payment would be unreasonable.[17] Under the circumstances, Defendants have been afforded a reasonable time within which to pay Plaintiffs.

---

[17] In the principal decision relied upon by Plaintiffs, *Evans, Mechwart, Hambleton & Tilton, Inc. v. Triad Architects, Ltd.*, 965 N.E.2d 1007, 1017 (Ohio 2011), the court found and cited cases supporting its finding, that a period of three

### *2.*   *Defendants' claims of deficiencies and inefficiencies*

Defendants contend that Plaintiffs are not entitled to summary judgment in the amount that Plaintiffs billed because of deficiencies and inefficiencies in Plaintiffs' performance. Plaintiffs argue that they are entitled to payment as a matter of law because Defendants terminated the Subcontracts "for convenience" under Article X, rather than for subcontractor default under Article IX. (Motion at 14 – 16.) Indeed, Defendants have not introduced any evidence to suggest that Plaintiffs defaulted. Nevertheless, Defendants maintain that they can withhold payment because Summit has asserted that all of the invoices that Schmid presented to Summit should be discounted by between 29 and 46 percent. (Opposition at 7, 14.) In support of their argument, Defendants cite the subcontract, which provides that Plaintiffs assumed Schmid's performance obligations to Summit, and that Schmid has the same rights and remedies against the subcontractors as Summit has against Schmid. Defendants thus contend that they can withhold payment "until Summit's claims regarding inefficient and deficient work are resolved in the Summit Litigation." (*Id.* at 14.)

Significantly, Defendants have presented no factual evidence that would support their contention that the amounts due should be reduced by an offset. In the absence of any factual assertion by Defendants that Plaintiffs actually failed to perform the work that they invoiced, Defendants fail to raise a genuine issue for trial on the question of whether Plaintiffs currently are

---

or four years is unreasonable. A two-year period is appreciably shorter than a three-year period. Nevertheless, it affords a more than reasonable period for a contractor to pursue payment from a client. None of the cases cited by the parties suggests that the reasonable time must be measured by the often protracted time required to obtain relief through litigation. In *Avon Brothers, Inc. v. Tom Martin Const. Co.*, No. A-1681-99T1, 2000 WL 34241102 (N.J. Super. Ct. App. Div. Aug. 30, 2000), the court described the reasonable period as "the time within which the general contractor is actively pursuing collection and while there remains a reasonable likelihood that the general contractor will actually collect the final payment due from the owner." *Id.* at *8 (citing *Dyer*, 303 F.2d at 661). However, although litigation remained pending, the court in *Avon Brothers* concluded that this guideline was "not always sufficient" and that the passage of "more than three years" in litigation meant that "the reasonable time … ha[d] long since passed." *Id.* (citing *Moore v. Continental Cas. Co.*, 366 F. Supp. 954, 956 – 57 (W.D. Okla. 1973) (finding that two years was "more than a reasonable period of time to wait for payment")). If the contractor wants to make litigation the yardstick by which to measure reasonable delay, then it should express that intention in its subcontracts.

entitled to payment in the full amount claimed, subject to any contingent claim arising out of the *Schmid v. Summit* litigation.[18] In the absence of such a factual showing, Defendants do not have an independent basis to deny Plaintiffs payment under the subcontracts or the Payment Bond. Defendants' claims of inefficiencies and deficiencies, which claims are asserted by way of a counterclaim and in defense of Plaintiffs' claims, do not preclude the entry of summary judgment on Plaintiffs' contract claim. In other words, on this record, Schmid was obligated to make payment within a reasonable time without any discount or offset for any deficiencies or inefficiencies.[19]

## B. The Prompt Payment Statute

The Maine Prompt Payment Act regulates the payment obligations of contractors and subcontractors. 10 M.R.S. § 1114. The provisions of the statute, which include penalties for certain violations, "act as 'disincentives to withholding amounts due,' and are 'intended to augment damages that are traditionally available for contract or quantum meruit claims.'" *Cellar Dwellers, Inc. v. D'Alessio*, 2010 ME 32, ¶ 17, 993 A.2d 1, 6 (quoting *Jenkins, Inc. v. Walsh Bros.*, 2001 ME 98, ¶ 24, 776 A.2d 1229, 1237). In order to obtain the statutory remedies, "it is not sufficient for the party seeking penalties to prove that work was completed and that an outstanding balance exists." *Jenkins*, 2001 ME 98, ¶ 24, 776 A.2d at 1237. In addition, the subcontractor must prove: (1) that the services were performed in accordance with the agreement or understanding of

---

[18] The mere existence of contingent claims against Plaintiffs, based on Summit's counterclaim (ECF No. 6) in the *Schmid v. Summit* litigation (1:13-cv-00464-GZS), is not a sufficient basis to continue to withhold payment from Plaintiffs. Rather, because Schmid's claims against Plaintiffs are contingent, Schmid remains obligated to pay Plaintiffs within a reasonable time.

[19] Defendants' argument that payment can be withheld "until Summit's claims regarding inefficient and deficient work are resolved in the Summit Litigation," is problematic for additional reasons. For example, the record does not establish that resolution of the claims between Schmid and Summit will necessarily resolve any question regarding inefficiencies related to Plaintiffs' HDD work. Additionally, insofar as Plaintiffs are not party to that proceeding, a judgment in that proceeding in favor of Summit would not necessarily bind Plaintiffs.

the parties; (2) that the owner has made the progress or final payment; (3) that the subcontractor has invoiced the work; and (4) that the contractor failed to make payment within seven days after receipt of the invoice, or after receipt of the progress or final payment from the owner, whichever is later. *Id.*

Plaintiffs argue that Schmid cannot avoid the penalties of the statute because Schmid directed Plaintiffs' work and because Schmid terminated the subcontracts for convenience rather than for subcontractor default. (Motion at 19 – 20.) Defendants contend that they have not ignored the payment terms because Schmid has not received payment from Summit, has a reasonable time in which to pursue claims against Summit, and has a good faith basis to withhold payment due to Summit's counterclaim. Defendants also argue that Plaintiffs must, in any event, establish the precise amount due and the exact payment deadline. (Opposition at 13 – 16.)

### 1. 10 M.R.S. § 1114(1)

Section 1114(1) of the Prompt Payment Act establishes as the statutory baseline that payment from a general contractor to a subcontractor must be made in accordance with the terms of the subcontract. Despite the determination that a reasonable period of time for payment has expired, as explained below, Plaintiffs are not entitled to summary judgment on their statutory prompt payment claims.

### 2. 10 M.R.S. § 1114(2)

Subsection 2 applies when the contractor fails to disclose to the subcontractor the due dates for payments from the owner. *Id.* § 1114(2). Plaintiffs have not shown through uncontroverted evidence that Defendant Schmid failed to disclose the due date for receipt of payments from the owner prior to executing the subcontracts. *Id.* Insofar as the subcontracts provide that the

provisions of the Principal Contract are incorporated into the subcontracts, a fact finder could conclude that the payment terms of the Principal Contract were made available to Plaintiffs.

### 3. 10 M.R.S. § 1114(3)

Section 1114(3) requires that a subcontractor be paid the "amount received for" the subcontractor's work, within "[seven] days after receipt" of payment from the owner, when receipt of payment from the owner occurs after receipt of the subcontractor's invoice. *Id.* § 1114(3). Plaintiffs have failed to establish through uncontroverted evidence that Schmid received payment from Summit for Plaintiffs' work. Plaintiffs thus are not entitled to summary judgment on their claim under section 1114(3).

### 4. 10 M.R.S. § 1114(4)

Section 1114(4) imposes a statutory interest penalty. To obtain the interest penalty, a subcontractor must establish that a progress or final payment was "delayed beyond the due date established in subsection 2 or 3." *Id.* § 1114(4). Because factual issues remain in dispute as to whether payment was due as contemplated by subsection 2 and 3, summary judgment on Plaintiffs' request for the statutory interest penalty is not appropriate.[20]

### 5. 10 M.R.S. § 1118

Section 1118 requires an arbitrator or a court to award a penalty for the "wrongful withholding" of payments in "an amount equal to 1% per month of all sums for which payment has wrongfully been withheld." *Id.* § 1118(2). Additionally, section 1118 authorizes an award of "reasonable attorney's fees … together with expenses" for "the substantially prevailing party in any proceeding to recover any payment within the scope of this chapter." *Id.* § 1118(4). Section

---

[20] In effect, the Act suggests that the Legislature did not intend to impose the interest penalty if the contractor has not received payment from the owner for the subcontractor's work. This reading is consistent with the "strict construction analysis" required for penal statutes. *Marquis v. Farm Family Mut. Ins. Co.*, 628 A.2d 644, 651 (Me. 1993)

1118 provides the following definition for "wrongful withholding": "A payment is not deemed to be wrongfully withheld if it bears a reasonable relation to the value of any claim held in good faith by the owner, contractor or subcontractor against which an invoicing contractor, subcontractor or material supplier is seeking to recover payment." *Id.* § 1118(3).

Although the section 1118(3) definition of wrongful withholding does not include a reference to the "receipt" of payment, the Maine Supreme Judicial Court has held that the Section 1118 remedies are not available absent a showing that, inter alia, "the owner has made the progress or final payment." *Jenkins*, 2001 ME 98, ¶ 24, 776 A.2d at 1237 (addressing the availability of the remedies stated in section 1114(4), 1118(2), and 1118(4)). *See also id.* at ¶ 31, 776 A.2d at 1239 – 40 (linking the "substantially prevailing party" standard for an attorney fee award to proof of a wrongful withholding coming under another penalty provision). Indeed, the Court explicitly held in *Jenkins* that success on the underlying breach of contract claim, standing alone, is not sufficient to obtain relief under the Act. *Id.* Accordingly, even though Plaintiffs have established that a reasonable time for payment has expired, they have not demonstrated that they are entitled to summary judgment on their claims for the penalty authorized by section 1118.

## CONCLUSION

Based on the foregoing analysis, I recommend that the Court grant in part and deny in part Plaintiffs' Motion for Summary Judgment. In particular, I recommend that the Court determine Plaintiffs are entitled to payment of their outstanding invoices without further delay (Counts I –

III).[21] I also recommend that the Court deny the Plaintiffs' motion with respect to Plaintiffs' claim for additional remedies under Maine's Prompt Payment Act (Count IV).[22]

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 19th day of November, 2015.

---

[21] The determination of a reasonable period of time is generally dependent upon the facts and circumstances of each case, at least where the parties dispute the issue and the non-movant asserts that the delay is reasonable. *Swanda Bros. v. Chasco Constructors, Ltd., L.L.P.*, No. 5:08-cv-00199, 2012 WL 4482250, at *3 (W.D. Okla. Sept. 26, 2012). Implicit, if not explicit, in the recommendation is that regardless of any disputes as to the facts and circumstances, as a matter of law, to defer payment for more than two years would be unreasonable. As explained above, such a result it consistent with the reasoning of other courts that have considered similar contract language. Plaintiff, however, contends that the reasonable period of time expired much earlier. For instance, in their reply memorandum, Plaintiffs argue, at least as to Liberty Mutual, that the reasonable period of time expired ninety days after Plaintiffs ceased work. (Pl. Reply at 3.) In support of the argument, Plaintiffs cite the terms of the bond issued by Liberty Mutual. (*Id.*) The bond as well as Schmid's diligence and reasonableness in its pursuit of its claim against Summit, which necessarily includes an evaluation of the merits of Schmid's claim and Summit's defenses, would be among the evidence that is relevant to a determination of the exact date on which the reasonable period of time expired. Because the parties dispute some of the material facts and circumstances (e.g., the reasonableness of Schmid's collection efforts), to the extent that Plaintiffs seek to establish the reasonable period of time expired at an earlier date, summary judgment would not be appropriate on that issue.

[22] Plaintiffs moved for summary judgment on "all claims and counterclaims." (Pl. Motion at 20.) In their counterclaim in each of the consolidated cases, Defendants in essence assert a claim for indemnification/contribution should Summit prevail on its claims against Schmid based on the efficiency or quality of work performed by Schmid. As explained above, Defendants' counterclaims, therefore, are contingent claims. Because the counterclaims are contingent, even though Defendants have not presented factual evidence to support an offset against the amounts owed to Plaintiffs, summary judgment on the counterclaims is not appropriate. The counterclaims depend on future events and have not yet accrued. *St. Paul Ins. Co. v. Hayes*, 676 A.2d 510, 511 (Me. 1996). In other words, Defendants' counterclaim would not be in order for disposition unless and until Schmid has satisfied a common liability to Summit. *Id.* If the Court adopts the recommended decision, because resolution of the statutory prompt payment claims might not require the resolution of the inefficiency and quality issues, the Court might consider dismissing without prejudice the counterclaims. Defendants could seek to reassert their claims for indemnification/contribution in this or a separate action should Summit establish Schmid's liability.